Anne Andrews, Esq. (SBN: 103280)
Sean T. Higgins, Esq. (SBN 266888)
Kimberly DeGonia, Esq., (SBN 256989)
Ryan M. McIntosh, Esq. (SBN: 328042)
**ANDREWS & THORNTON**
4701 Von Karman Ave., Ste 300
Newport Beach, CA, 92620
Tel.: (949) 748-1000
Fax: (949) 315-3540
survivor@andrewsthornton.com

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JARED JONES<br><br>                    Plaintiff,<br><br>          v.<br><br>THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS (a corporation), and DOES 1-500, Inclusive,<br><br>                    Defendants. | **CASE NO.: 2:25-cv-00227**<br><br>**COMPLAINT FOR DAMAGES**<br><br>1. **Sexual Abuse of a Minor (Against THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS, and DOES 1-500)**<br>2. **Negligence (Against THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS, and DOES 1-500)**<br>3. **Negligent Infliction of Emotional Distress (Against THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS, and DOES 1-500)**<br><br>**DEMAND FOR JURY TRIAL** |

1.      Plaintiff JARED JONES by and through his attorneys, Andrews & Thornton, Watts Law Firm, bring this action against Defendants THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS (a corporation), and DOES 1-500.

1

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

2.      Defendant THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS ("L.D.S. CORP.")[1] is a money-making, profiteering enterprise. Make no mistake. L.D.S. CORP. is one of the richest corporations in the world, and one of its primary endeavors is to make even more money. The consequence of that commercial focus is devastating for the hundreds-- if not thousands-- of victims of childhood sexual abuse, like Plaintiff herein, at the hands of leaders of L.D.S. CORP. L.D.S. CORP.'s obsession with money drives decisions at all levels. In order to preserve the influx of generations of tithing and other financial commitments from congregants, and to entice others to join L.D.S. CORP. to add to the number of tithing members, L.D.S. CORP. hides, covers up, and ultimately knowingly and directly benefits from the trafficking of children. This case is about two such children who were threatened, harassed, intimidated, and sexually abused, masturbated, groped, kissed, and fondled many times by a serial abuser, in Riverside, California, and who the L.D.S. CORP. knowingly enabled to be put in positions of power over other children and potential victims.

3.      Upon information and belief, L.D.S. CORP. knew Defendant Arlin Hatch was a danger to children. Instead of alerting its congregants to the dangers Arlin Hatch posed to young children, L.D.S. CORP. and its Defendant Bishop hid Arlin Hatch's actions, allowing and encouraging him to remain an active member of the L.D.S. CORP. and go on a three-year mission for L.D.S. CORP., where he would have constant access to other potential victims while proselytizing on behalf of the L.D.S. CORP. By secreting the presence of a known predator in its midst, L.D.S. CORP. ensured that its congregants would continue pouring money into its coffers, which L.D.S. CORP. would then invest and profit from.

## PRELIMINARY STATEMENT

4.      Upon information and belief, Arlin Hatch had a history of sexual abuse before abusing Plaintiff JARED JONES. Upon information and belief, L.D.S. CORP. knew of Arlin Hatch's deviant, pedophilic sexual history and yet it continued to hold Arlin Hatch in high esteem

---

[1] On information and belief, The Church of Jesus Christ of Latter-day Saints also does or at some times in the past has done business as Corporation of the President.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

as a priest in the L.D.S. CORP. and enabled him to have unfettered access to numerous potential victims for years. Arlin Hatch was held out by the L.D.S. CORP. as a rising star in the community.

5.      Upon information and belief, the L.D.S. CORP. had received reports that Arlin Hatch had abused other children, including at least one of his own siblings. Upon information and belief, Bishop Scott Jones was aware of this because of his role at the time as Bishop of his ward in the Riverside Stake. A ward is a local congregation of L.D.S. CORP. members. A stake is made up of multiple wards, generally between five to ten wards.

6.      Upon information and belief, L.D.S. CORP. Bishop Scott Jones disregarded the threat Arlin Hatch posed to other children in the ward, including his son, JARED JONES. Instead, Bishop Scott Jones acted consistent with L.D.S. CORP.'s playbook, covering up Arlin Hatch's abuse of other children to preserve the image of the organization and his ward. This included putting JARED JONES in danger by regularly asking Arlin Hatch to babysit them, including all four of his youngest children.

7.      On at least one such occasion in approximately 1989, when JARED JONES was 7 years old, while PLAINTIFF' parents, Bishop Scott Jones and Lisa Jones, were attending an L.D.S. CORP.-sponsored event, Arlin Hatch sexually abused PLAINTIFF.

8.      Arlin Hatch acted in a practiced and calculated way, asking the child PLAINTIFF if they wanted to see a magic trick. When they innocently said yes, he removed his pants and underwear and told PLAINTIFF they needed to kiss and touch his penis to see the magic trick happen. When PLAINTIFF resisted, ARLIN became angry and insistent that they needed to listen to him, using his authority as a Priest in the L.D.S. CORP. and the person their Bishop entrusted them to as a means of forcing them to comply. While demanding they kiss and touch his penis, he masturbated in front of them until he ejaculated.

9.      PLAINTIFF's brother, Jacob Jones, was abused at the same time and brings his own separate complaint for such abuse, which corroborates PLAINTIFF's complaint. Jacob Jones disclosed the abuse he and PLAINTIFF endured to Bishop Scott Jones and Lisa Jones once they arrived home. However, Lisa Jones said she did not believe him and Bishop Scott Jones

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

punished Jacob Jones for talking about the abuse by spanking him and did nothing further to protect PLAINTIFF and his brother.

10.     Arlin Hatch underwent no discipline by L.D.S. CORP. for his abuse of Plaintiff. JARED JONES was forced to see and interact with ARLIN for years after the abuse at L.D.S. CORP. sponsored events, consistently retraumatizing PLAINTIFF and making him live in fear that it would happen again.

11.     Approximately two years after the abuse, in 1991, just a week before leaving for his mission trip, Arlin Hatch pulled Bishop Scott Jones aside at an L.D.S. CORP. event to speak with him. He said that in order to leave for his mission trip, he was required by L.D.S. CORP. to apologize for abusing PLAINTIFF. In an effort to protect L.D.S. CORP. and himself—the bishop and father who already knew of the abuse and failed to act upon the knowledge to protect his own children and others— Bishop Scott Jones accepted the apology on behalf of PLAINTIFF and did not tell PLAINTIFF about ARLIN's admission until PLAINTIFF and his brother each individually disclosed the abuse to him again, years later.

### *Aftermath of Abuse for JARED JONES*

12.     JARED JONES struggled to cope with the emotions he felt after the abuse. JARED became hypersexualized, endured nightmares of the abuse, and was reminded of the abuse every time he was in Arlin Hatch's presence or when discussions about sex were had at L.D.S. CORP. events and services.

13.     When JARED JONES was approximately 14 years old, in 1996, JARED told his bishop about the abuse. He also told former Bishop, Bishop Scott Jones about the abuse again. Neither Bishop Scott Jones nor the presiding bishop reported the abuse to the appropriate legal authorities. Instead, in an effort to protect the L.D.S. CORP. and as compensation for the abuse JARED had experienced, JARED's bishop required him to attend counseling at L.D.S. Family Services with a Marriage and Family Therapist named Pat Poor.

14.     L.D.S. Family Services is a branch of the L.D.S. CORP. which enables L.D.S. CORP. to silence victims under the guise of therapy and mental health counseling. However, the mental health counselors at L.D.S. Family Services are instructed by L.D.S. CORP. not to follow

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

state-mandated child abuse reporting laws and manipulate members who come to them for abuse into ignoring their abuse. They also often require members to continue or initiate further contact with their abusers and gaslight victims into pardoning abusers under the guise of healthy forgiveness and healing.

15.     JARED was forced to attend monthly counseling sessions with a therapist and his Bishop. His counselor and bishop required him to write a letter to Arlin Hatch forgiving him for his sexual abuse.

16.     Arlin Hatch's abuse was never reported to appropriate authorities, including the police, child protective services, or even announced to members of the ward whose children were regularly in contact with ARLIN.

17.     L.D.S. CORP. covered up ARLIN's abuse to protect its reputation, maintain Arlin Hatch as a missionary to bring more members—and therefore more revenue—to the L.D.S. CORP., and to seek favor with the Hatch family, which provided the church with plentiful donations, tithes, and free labor as leaders in the L.D.S. CORP. Furthermore, other leadership of the L.D.S. CORP. at the Foothill Ward, including Bishop Scott Jones, had close personal, social, and business relationships with the HATCH family. Therefore, L.D.S. CORP. made concerted efforts to cover up the abuse, refrain from reporting the abuse, and protect the abuser's interests above those of the victims.

## JURISDICTION AND VENUE

18.     This Court properly has diversity jurisdiction to hear civil claims where complete diversity between Plaintiff and defendants exists and the amount in controversy exceeds $75,000, pursuant to 28 U.S.C. § 1332(a).

19.     Complete diversity of citizenship occurs when no plaintiff and defendant are domiciled in the same state.

20.     In determining whether diversity jurisdiction exists, a corporation is considered to be a citizen of both its state of incorporation and its principal place of business.

21.     DEFENDANT L.D.S. CORP. is incorporated and has its principal place of business in Salt Lake City, Utah.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

22.    PLAINTIFF JARED JONES resides in Riverside, California.

23.    PLAINTIFF is therefore completely diverse from DEFENDANTS.

24.    Venue in this Court is proper pursuant to 28 U.S.C. § 1391 in that a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District, and Defendants are subject to personal jurisdiction in this District.

25.    State law causes of action I-III are timely brought pursuant to California Insurance Code §11583, which requires corporations that have provided payment or partial payment as an accommodation to an injured person to, at the time of beginning payment, notify the recipient of the payment in writing of the statute of limitations applicable to the cause of action for which the payment is being made. Counseling services and behavior modification therapy qualify as such payment necessitating notice of the applicable statutes of limitations. Without such written notice to the Plaintiff of the statutes of limitations, California Insurance Code §11583 provides for "tolling of the statute of limitations from the date of the advance payment to the date on which the claimant retains counsel or the date upon which the statutory notice is given, whichever comes first."

26.    JARED JONES was not informed in writing of the statutes of limitations for each of his causes of action. Therefore, the statute of limitations for his claim in response to the sexual abuse has been tolled since the year he received treatment from the L.D.S. CORP. until he obtained legal counsel or otherwise received written notice of the statute of limitations for his claim by L.D.S. CORP.

27.    Because JARED received treatment as payment while he was a minor, his statute of limitations on any related action had not yet begun to run. Since then, JARED has not received notice of the applicable statutes of limitations in writing from L.D.S. CORP. Therefore, his full statute of limitations for each action herein alleged has been tolled until 2024 upon obtaining legal counsel.

**DEFENDANT PARTIES**

**I.    The Church of Jesus Christ of Latter-Day Saints**

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

28. THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS is a corporation duly organized and operating pursuant to the laws of the State of Utah, with its principal place of business at 50 East North Temple, Floor 20, Salt Lake City, State of Utah 84150. However, L.D.S. CORP. operates meeting houses, congregations, and temples (wards, stakes and areas) within the state of California. Indeed, this case centers around one such ward in Riverside, California. L.D.S. CORP. is registered to do business in California. The presiding bishop of the Foothill WARD serve at the pleasure of and subject to the direct and absolute control of L.D.S. CORP. In addition, L.D.S. CORP. collects tithes, accepts donations, invests money, and covers up childhood sexual abuse in the state of California. Specifically, this Court has specific personal jurisdiction over L.D.S. CORP. arising out of the facts alleged herein: the sexual abuse and the resulting coverup. As alleged herein, the acts of L.D.S. CORP. in enabling the abuse and trafficking of Plaintiff and resulting coverup were directed towards California. As alleged herein, by retaining and obtaining additional tithes, donations and profits from congregants in California as a result of the coverup of Plaintiff' abuse, L.D.S. CORP. purposefully availed itself of the privilege of conducting activities within California, thus invoking the benefits and protection of its laws. This case, and PLAINTIFF'S injuries alleged herein, directly arise out of L.D.S. CORP.'s activities that took place in California.

29. At all times relevant to the allegations listed herein, PLAINTIFF was members of the Foothill Ward, currently located at 11150 Collett Avenue Riverside, CA 92505. The Foothill Ward ("WARD") is wholly owned and operated by its parent, L.D.S. CORP. based in Salt Lake City, Utah.

30. A significant percentage of L.D.S. CORP.'s income comes from member tithes, some of which are used for traditional administrative functions and charitable purposes. However, a large percentage of L.D.S. CORP.'s income also comes from other financial commitments above and/or separate from tithes. Unbeknownst to most congregants and the public until recently, L.D.S. CORP. uses income from both tithing and other financial contributions from congregants for strictly commercial enterprises, including financial investment vehicles like stock, real estate, and other profit-generating market endeavors. In 1997,

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

L.D.S. CORP. created a non-profit entity called Ensign Peak Investments whose articles of incorporation specify that it is organized exclusively for religious, educational, and charitable purposes. Ensign Peak Investments benefited from tax exemptions pursuant to § 501(c)(3) of the Internal Revenue Code. Despite this, based on information and belief, Ensign collected donations and tithes for more than two decades, without ever disbursing the funds towards any charitable purpose. Upon information and belief, L.D.S. CORP. benefited from Ensign's non-profit status by receiving billions of dollars in tax breaks from the interest of investments, without doing anything charitable, religious, or educational. L.D.S. CORP. does not provide information about their finances to their members or the public. Upon information and belief, L.D.S. CORP. receives more than seven (7) billion dollars a year in tithing from members. Upon information reported publicly in the media, L.D.S. CORP. owns financial assets and real estate in excess of 200 billion dollars.

31.    Arlin Hatch was an agent of Defendant L.D.S. CORP. Perpetrator Arlin Hatch was 17 years old at the time of the sexual offenses alleged herein. Arlin Hatch was ordained a holder of the Aaronic Priesthood (an elite group of members of L.D.S. CORP. which are appointed by the Stake President and entrusted with authority to baptize, ordain others, bless the sacrament, and perform other duties vital to L.D.S. CORP.), a holder of the Melchizedek Priesthood (a prestigious leadership role given only to male members of the L.D.S. CORP. which gives holders the authority to give special blessings, ordain others, and which signifies that the men are so worthy that they have the power of God), and was ordained an Elder at the time of the abuse. Arlin Hatch was also a member of a prominent, well-established family in the community which provided free labor, leadership, tithes, and other services to the L.D.S. CORP. Arlin Hatch regularly interacted with PLAINTIFF and other potential victims at L.D.S. CORP. sponsored events, assisting at his mother's preschool business which was associated with the L.D.S. CORP., and when he acted as a babysitter for the Jones family.

32.    An agent of the L.D.S. CORP., Bishop, Bishop Scott Jones, called upon Arlin Hatch as a role model and priesthood holder to babysit JARED JONES so that Bishop Scott and his wife would be able to attend an L.D.S. CORP. sponsored-activity. Therefore, Hatch, whether

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

directly or indirectly, and for all intents and purposes, operated and acted through and for the L.D.S. CORP. Arlin Hatch was at all times alleged herein under the control of his dominant principal, L.D.S. CORP. At all times herein alleged, his babysitting was on behalf of, for the benefit of, at the direction of, and at the behest of L.D.S. CORP. and were ratified by L.D.S. CORP. Further, each of the acts of the LEADERSHIP were done pursuant to and in accordance with L.D.S. CORP.'s policy.

33. Upon information and belief, L.D.S. CORP. restructured its ward territories with the help of Bishop Scott Jones to covertly reassign Arlin Hatch and his family to attend another ward which was entirely unaware of Arlin Hatch's predatory behavior.

34. Despite their knowledge that Arlin Hatch sexually abused other minor members of the L.D.S. CORP., and was likely abusing others including PLAINTIFF, L.D.S. CORP. permitted Arlin Hatch to continue attending services, and L.D.S. CORP.-sponsored activities at the ward where PLAINTIFF attended services, as well as other wards.

35. Each of the below listed individuals were agents of Defendant L.D.S. CORP. Bishop Scott Jones, Lisa Jones, and other leadership of L.D.S. CORP. whose names are unknown at this time, are individuals having leadership positions, directly or indirectly, in L.D.S. CORP., are comparable to corporate officers in each of the Riverside Stake entities, direct and participate in the day to day operations of the Stake, undertook financial decisions, were responsible for the acts of the Stake and L.D.S. CORP., and for all intents and purposes, operate and act through the L.D.S. CORP. Bishop Scott Jones, Lisa Jones, and unnamed leadership made the decision not to report allegations of child sex abuse to authorities, to harbor a known sex offender, and to allow the known sex offender unfettered access to innumerable children, including PLAINTIFF.

36. Furthermore, Bishop Scott Jones, Lisa Jones, and unnamed leadership were at all times alleged herein under the control of their dominant principal, L.D.S. CORP. At all times herein alleged, each of the acts of LEADERSHIP were on behalf of, for the benefit of, at the direction of, and at the behest of L.D.S. CORP. and were ratified by L.D.S. CORP. Further, each of the acts of the LEADERSHIP were done pursuant to and in accordance with L.D.S. CORP.'s policy.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

## II.    Doe Defendants 1-500

37.    The true names or capacities, whether individual, corporate, or otherwise, of Defendants DOES 1 through 500, inclusive, are unknown to Plaintiff who is therefore ignorant of the true names and sue said Defendants by such fictitious names. Plaintiff believes and alleges that each of the Defendants designated herein by fictitious names is in some manner legally responsible for the events and happenings herein referred to and caused damages proximately and foreseeably to Plaintiff as alleged herein. The true names, whether corporate, individual or otherwise, of Defendants 1 through 500, inclusive, are presently unknown to Plaintiff, which therefore sues said Defendants by such fictitious names, and will seek leave to amend this Complaint to show their true names and capacities when same have been ascertained.

38.    At all times hereinafter alleged, "DEFENDANTS" or "All DEFENDANTS" include all herein named Defendants as well as Defendants DOES 1 through 500, inclusive.

39.    At all times herein alleged, each of the DEFENDANTS was the agent, servant, partner, aider and abettor, co-conspirator and joint venturer of each of the remaining DEFENDANTS herein and was at all times operating and acting within the course, purpose and scope of said agency, service, employment, partnership, conspiracy and joint venture and rendered substantial assistance and encouragement to the other DEFENDANTS, knowing that their conduct constituted a breach of duty owed to Plaintiff and unlawful harm to Plaintiff.

### PLAINTIFF PARTY

40.    JARED JONES was at all times relevant to the tortious conduct herein mentioned a resident of the County of Riverside, State of California. At the time of filing this complaint, JARED JONES is a resident of Riverside, California.

### FACTUAL BACKGROUND

*L.D.S. CORP. Is a Profiteering Commercial Enterprise that Covers Up and Enables*

*Abuse to Protect Its Wealth and Reputation*

41.    The case is not about religious or doctrinal beliefs in any way. This case is about an organization that has retained a known predator and permitted its youth members to be repeatedly sexually abused.

10

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

42.     In 2017, a lengthy expose compiled by a child abuse health researcher was released online. The 300-page document details hundreds of instances of sex abuse within L.D.S. CORP. taken primarily from public court filings. The research is an eye-opening look into the pervasiveness of childhood sexual abuse in L.D.S. CORP. and their inadequacy in responding to it. A common theme emerges of ward bishops and leaders being given information of child sexual abuse in the ward, information which is then passed along to L.D.S. CORP. Nothing is done. No one is told. And the abuse continues.

43.     In the rare circumstance a report is made to the authorities, the L.D.S. CORP. still diminishes, denies, and conceals evidence of the abuse and their knowledge of it from L.D.S. CORP. members, authorities, and the public at large.

44.     L.D.S. CORP. maintains a pattern and practice of concealing abuse from the authorities, and signals that its members should conceal and/or fail to report abuse so as to keep "the L.D.S. CORP. from being inappropriately implicated in legal matters." See President Russell M. Nelson Letter (August 4, 2020). Through this policy of concealment, L.D.S. CORP. ratifies abusive conduct, perpetuating a culture of concealment and encouraging a lack of cooperation among L.D.S. CORP. members with law enforcement. This case is no different.

45.     L.D.S. CORP. is well known for its meticulous record keeping. L.D.S. CORP. maintains an archive of records at Granite Mountain Records Vault located in the foothills surrounding the Salt Lake Valley in Utah. These records detail important circumstances surrounding individual members. Reports are created and maintained at individual wards that detail membership attendance, genealogy of members, addresses of members, reports of abuse, and reports regarding disciplinary proceedings. These records are then sent from the individual wards to the record archives that are maintained in the greater Salt Lake City area in Utah. The records and custom and practice of maintaining records require an individual record for each member. The disciplinary records are comprehensive and detailed, per the practices of L.D.S. CORP.

46.     L.D.S. CORP.'s written policies shed light on their general priorities. According to the L.D.S. CORP.'s General Handbook, "The purposes of L.D.S. CORP. discipline are (1) to

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

save the souls of transgressors, (2) to protect the innocent, and (3) to safeguard the purity, integrity, and good name of the Church. These purposes are accomplished through private counsel and caution, informal probation, formal probation, disfellowshipment, and excommunication." See pgs. 93-95.  The Stake Presidents and Bishops Handbook states as follows: "[i]n instances of abuse, the first responsibility of the Church is to assist those who have been abused, and to protect those who may be vulnerable to future abuse."

47.    More specifically, L.D.S. CORP. notes in its administrative handbook that the second purpose of Church discipline is to protect the innocent. Yet, perpetrators go undisciplined until discipline is made necessary by an external force. Disclosure of the identity of others who participated in a transgression may be required when it is necessary to restore or protect persons who have been or may be seriously injured as a result of the transgression. L.D.S. CORP.'s position is that abuse cannot be tolerated in any form. Abusers should not be given Church callings, which are positions of service that members are appointed to through revelation and the Spirit. Additionally, abusers may not have a temple recommend, which signifies that a member can enter the temple. Even if a person who abused a child sexually or physically receives Church discipline and is later restored to full fellowship or readmitted by baptism, leaders should not call the person to any position working with children or youth unless the First Presidency authorizes removal of the annotation on the person's membership record. The First Presidency is the highest governing body in L.D.S. CORP. and consists of a prophet and two prophet counselors.

48.    L.D.S. CORP.'s written policies may look congruent with reasonable care on their face. However, a quicky look reveals that they are sorely lacking. Nevertheless, the policies they put into practice diverge significantly from even those written in its Handbook.

49.    L.D.S. CORP. maintains a national Helpline that purports to assist victims in reporting their sexual assaults. However, L.D.S. CORP. implements the Helpline not for the protection and counseling of sexual abuse victims, as professed in L.D.S. CORP. literature, but for Kirton McConkie attorneys to snuff out complaints and protect L.D.S. CORP. from potentially costly lawsuits and jury verdicts. This is consistent with the instructions set forth in

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

President Russell M. Nelson Letter, dated August 4, 2020, encouraging congregants to avoid cooperating with authorities asking for information on abuse.

50.    In conjunction with the doctrine of helping victims, Utah's Supreme Court has characterized the Helpline used by L.D.S. CORP. as "a 1-800 number that bishops and other L.D.S. CORP. clergy can call when they become aware of possible abuse. The Help Line is available 24 hours a day, 365 days a year and is staffed by legal and counseling professionals who 'provide guidance to the bishop on how to protect the [victim] from further abuse, and how to deal with the complex emotional, psychological, and legal issues that must be addressed in order to protect the victim.'" *MacGregor v. Walker*, 2014 UT 2 ¶2,322 P.3d 706, 707 (2014) [internal citation omitted in original].

51.    In reality, L.D.S. CORP. primarily staffs the Helpline with attorneys of Kirton McConkie, one of the largest law firms in the State of Utah.  Rather than notifying law enforcement or other government authorities when Bishops and other clergy members call the Helpline regarding sexual abuse within L.D.S. CORP. Helpline operators transfer these calls to the Kirton McConkie attorneys, who advise the caller not to report the abuse incident to law enforcement, misrepresenting clergy-penitent privilege laws as their reasoning.

52.    In another sexual abuse-related civil lawsuit against the Mormon L.D.S. CORP. and its agents, a Kirton McConkie attorney "acknowledged during a pretrial deposition that the firm uses information gleaned from helpline calls to identify cases that pose a high financial risk to the Mormon Church" *See* The Mormon Church Has Been Accused of Using a Victim's Hotline to Hide Claims of Sexual Abuse (https://www.vice.com/en/article/duty-to-report-the-mormon-church-has-been-accused-of-using-a-victims-hotline-to-hide-sexual-abuse-claims/).

53.    *The Sins of Brother Curtis* recounts the horrific details of L.D.S. CORP.'s systemic failure to address known predators in its leadership. Lisa Davis, *The Sins of Brother Curtis* (2011). Brother Curtis was an elder in L.D.S. CORP., a position attained by most men after a worthiness interview by the stake president -the leader of a group of local congregations. Despite spending numerous years in prison for crimes he committed prior to joining L.D.S. CORP., he was deemed worthy to hold the position of an elder. Countless L.D.S. CORP. leaders

13

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

learned of Brother Curtis' tendencies to molest children but failed to report him or inform their congregants. Brother Curtis sexually abused at least twenty (20) minors over a 14-year span. Despite leaders within L.D.S. CORP. knowing of Brother Curtis' proclivity for sexually abusing minors, L.D.S. CORP., as part of a national conspiracy spanning decades, moved Brother Curtis from a ward in Oregon to Wyoming back to Oregon then to Michigan and finally back to Oregon. At one point, Brother Curtis had been excommunicated but was permitted to be rebaptized into L.D.S. CORP. where he continued to sexually abuse minors.

54.    Upon information and belief, Arlin Hatch sexually abused other children not named as a plaintiff in this lawsuit. Upon information and belief, ARLIN was sexually abusing other children from the WARD, including one of ARLIN's siblings, prior to sexually abusing JARED JONES. Even after JARED's abuse was reported to L.D.S. CORP., ARLIN was never asked to stop attending L.D.S. CORP-sponsored events or services, despite the risk he posed to other children. Nor did L.D.S. CORP. or any of its agents notify parents of children in the WARD who were already or prospectively at risk of being victimized by Arlin Hatch. Upon information and belief, L.D.S. CORP. required adults who knew of Arlin Hatch's unlawful, perverted sexual actions, to remain quiet about it.

55.    Eventually, after multiple disclosures and obvious distress from JARED, L.D.S. CORP. required Plaintiff to attend a therapy program provided by L.D.S. CORP. to process his trauma, to no avail.

56.    After the therapy, JARED remained psychologically and emotionally traumatized. As a result of the abuse he endured and the inaction in addressing the harm he experienced, JARED was made more vulnerable to child predators and went on to be victimized by another child abuser outside of the L.D.S. CORP. community when he was 17 years old. He reported the rape to his presiding bishop after it happened in 1997, and again reported the abuse he endured from Arlin Hatch. Because JARED JONES associated both encounters with Arlin Hatch, his presiding bishop again did not report the abuse to appropriate legal authorities, and instead punished JARED JONES, blaming him for the abuse he endured.

57.    JARED JONES never recovered from the abuse he experienced as young child.

14

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

58.     Now, as a father himself, JARED JONES is experiencing deja vu as he litigates his own daughter's sexual abuse perpetrated by another child predator in the same ward. This speaks to the pervasive culture of covering up and fostering sexual abuse of children in the L.D.S. CORP. and in Riverside Stake, as history has repeated itself.

*L.D.S. CORP. Failed to Protect PLAINTIFF and Enabled the Horrendous Abuse to Continue Beyond ARLIN HACH's First Reported Victims*

59.     Upon information and belief, Arlin Hatch sexually abused other children, including students at the L.D.S. CORP.- affiliated Hatch Preschool and one of his own siblings.

60.     The Hatch family was an esteemed family in the L.D.S. CORP. community, and each parent held numerous leadership positions, including Relief Society President, Young Women's, and others. L.D.S. CORP. proceeded to suppress the knowledge—both actual and constructive— as much as possible in order to preserve its own reputation and that of the Hatch family.

61.     Had it been made public knowledge that the teenage son of a prominent family at the Foothill Ward—a Ward in a strongly established Mormon community—the L.D.S. CORP. would have certainly lost donations, membership, and most significantly, willing members to perform the free labor on which the L.D.S. Corp. sustains itself. Therefore, upon information and belief, the L.D.S. CORP. and Bishop Scott Jones covered up the abuse.

62.     Bishop Scott Jones left Plaintiff in the complete care and control of Arlin Hatch for the benefit of the L.D.S. CORP. Upon information and belief, Bishop Scott Jones knew Arlin Hatch had prurient interests in minors, and as a way of coaching him to resist temptation, requested that he babysit PLAINTIFF. Arlin Hatch was 17 years old at the time and already serving in leadership roles within the L.D.S. CORP.

63.     While babysitting PLAINTIFF, Arlin Hatch isolated PLAINTIFF from his other siblings and sat them down on the couch in the living room of the Jones residence. ARLIN asked PLAINTIFF if they wanted to see a "really special magic trick," and when they said yes, he insisted that they promise not to tell anyone about it. PLAINTIFF agreed.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

64. DEFENDANT ARLIN then lowered his pants and showed PLAINTIFF his penis. DEFENDANT ARLIN demanded that PLAINTIFF must touch and kiss his penis. He used his authority as a Priest in the L.D.S. CORP. to intimidate the 7 and 8 year old PLAINTIFF into kissing and touching DEFENDANT's penis until he became erect. Arlin Hatch forced PLAINTIFF to watch as DEFENDANT masturbated until he ejaculated in front of PLAINTIFF. When PLAINTIFF tried looking away, refusing to participate, or begging DEFENDANT to stop, DEFENDANT would make threats not to tell anyone about what was happening, lorded his status in the church over them, and insisted they watch the "magic" that was happening.

65. When PLAINTIFF' parents, Bishop Scott Jones and Lisa Jones, arrived home from the L.D.S. CORP. event, PLAINTIFF's brother, Jacob Jones, reported the abuse to them, describing how sickened and violated he felt, and how he and PLAINTIFF did not understand what was happening. Bishop Scott Jones, who at that time was serving as the Bishop of their ward, was unsurprised by the disclosure, and Lisa Jones, who also served in Young Women's, said she did not believe him. JACOB JONES was subsequently brutally punished for the disclosure.

66. Bishop Scott Jones spanked Jared with a belt, telling him: "bend over, touch your ankles, and if you move, you'll get two more." Upon information and belief, Bishop Scott Jones never punished Arlin Hatch for sexually abusing PLAINTIFF, nor did he report the abuse to appropriate legal authorities.

67. At that time, Bishop Scott Jones had been a Bishop at the Riverside Foothill Ward, holding the highest-ranking leadership position he could at his ward. However, his term as Bishop was cut short by two years at the same time that the ward was being split and restructured. Upon information and belief, the L.D.S. CORP. intentionally divided the ward and removed Bishop Scott Jones as leader because of reports of child sex abuse perpetrated against and by members of the ward, including Arlin Hatch.

68. Although Bishop Scott Jones was no longer the presiding bishop of their newly assigned ward, he remained a prominent, revered, and highly active member of the L.D.S. CORP., holding true to the common saying: "once a bishop, always a bishop." He also continued

16

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

to serve in leadership roles at the new ward, including as Home Teacher, Sunday School Teacher, Seminary Teacher, and other roles in the Bishopric. At that time, Bishop Scott Jones also worked as a Private Investigator for attorney Boyd Jensen, who was employed by the L.D.S. CORP. to defend L.D.S. CORP. in child sex abuse cases. This further bolstered Bishop Scott Jones's devotion to L.D.S. CORP. Therefore, even after his term as bishop ended, he continued to act as an agent on behalf of L.D.S. CORP.

69.   Therefore, Bishop Scott Jones was highly aware that L.D.S. CORP. has a practice of ignoring sexual crimes and misconduct whenever it is financially beneficial to them. Furthermore, L.D.S. CORP. has a pattern and practice of placing known sexual predators in positions with authority over children with the deluded excuse that it helps the perpetrators face and overcome their criminal temptations. Here, Bishop Scott Jones knew of Arlin Hatch's past predatory sexual indiscretions, including abusing one of his own family members. Rather than report it, or prevent Arlin Hatch from having access to further victims, he acted on behalf of L.D.S. CORP. and according to their practices as a Bishop and legal agent of the L.D.S. CORP. when he asked Arlin Hatch to babysit JARED JONES.

70.   L.D.S. CORP.'s purported policy to "protect victims" is a farce. L.D.S. CORP. is far more interested in protecting its financial commitments and the appearance of its moral reputation. This case is the perfect example, L.D.S. CORP. could and should have prevented Arlin Hatch from interacting with other children when initial allegations were made, at least a year before leaving for his mission. Furthermore, members of the congregation—at the very least, members who were parents to children, especially those whose children attended the Hatch Preschool—should have been informed of the threat to children's safety, so they could have responded in an appropriate manner to protect their children and identify potential signs of abuse. Importantly, clergy of L.D.S. CORP. who PLAINTIFF later disclosed their abuse to were by 1996 mandated to report every individual instance of abuse for which there was even a reasonable suspicion a child was being abused. Cal. Penal Code § 11166 (1996). At the very least, these disclosures could have warned the WARD of Arlin Hatch's past and would have led to more robust and better-informed investigations by law enforcement. The reality is that every abuse

17

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

victim—especially given the extremely young ages of the Plaintiff in this suit—holds valuable and irreplaceable information that law enforcement needs in order to identify the perpetrator, identify the root cause of the unlawful acts, identify other potential victims, and potentially even identify a perpetrator who introduced Arlin Hatch to sexual abuse.

71. By wrongfully failing to make a report to law enforcement upon learning Arlin Hatch's victims, the L.D.S. CORP. prevented law enforcement from performing its mandatory duty to investigate, which would have produced evidence of Arlin Hatch's calculated and perverted sexual abuse of children.

72. Instead, L.D.S. CORP. and LEADERSHIP allowed Arlin Hatch to continue completely unhindered and even protected his predatory conduct. L.D.S. CORP., its agents, and employees, including bishops, counselors, or personnel mentioned herein, DOES 1- 500, and each of them, acted to protect the heinous and unforgivable acts of its member, Arlin Hatch, and in such action taken against PLAINTIFF's innocence and vulnerabilities, were careless, reckless, negligent, and consciously disregarding a minor's rights.

**PUNITIVE DAMAGES ALLEGATIONS**

73. PLAINTIFF repeats and re-alleges the allegations set forth in the above paragraphs 1-72 as though fully set forth herein.

74. At all times herein, DEFENDANTS knew or should have known of Arlin Hatch's history of child sex abuse. L.D.S. CORP. acted with reckless indifference for every child in the WARD and in California when they failed to report out, warn, or take any affirmative steps to protect children from Arlin Hatch. As a result of L.D.S. CORP.'s deliberate inaction, numerous children were endangered by Arlin Hatch.

75. Despite prior knowledge of Arlin Hatch's predatory behavior, L.D.S. CORP. maintained Arlin Hatch as a member in good standing with the corporation, allowing him to leave for a Mission and have access to more potential victims. As alleged herein, each of the DEFENDANTS and its agents played a role in enabling Arlin Hatch to abuse PLAINTIFF. This action by L.D.S. CORP. exceeded malicious and oppressive conduct against PLAINTIFF.

18

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

76.    Such conduct is willful, wanton and reckless, justifying an award of punitive damages in an amount to be proven at trial.

## COUNT I

### SEXUAL ABUSE OF A MINOR

### (Against L.D.S. CORP., Arlin Hatch, and DOES 1-500)

77.    PLAINTIFF incorporates by reference each and every prior paragraph of this Complaint as though set forth in full in this cause of action.

78.    While PLAINTIFF was a member of the L.D.S. CORP.'s community and reliant upon L.D.S. CORP., Arlin Hatch used his own position of authority to sexually abuse PLAINTIFF JACOB JONES and JARED JONES, including molestation, groping, fondling, oral copulation, kissing, masturbation, and other harmful misconduct with PLAINTIFF. PLAINTIFF did not consent to the acts, nor could PLAINTIFF have consented to the acts given his young age at the time of the abuse.

79.    Upon information and belief, L.D.S. CORP. by and through their agent, Bishop Scott Jones, ratified Arlin Hatch's sexual abuse of the PLAINTIFF because L.D.S. CORP. had knowledge through earlier reports of Arlin Hatch's abuse given to Bishop Scott Jones in his capacity as Bishop. Yet Bishop Scott Jones intentionally disregarded these and requested Arlin Hatch babysit PLAINTIFF on his behalf so that he and Lisa Jones could attend an L.D.S. CORP. event, and so that Arlin Hatch could fight his temptations, thus allowing Arlin Hatch to obtain access to, manipulate, and sexually abuse PLAINTIFF. L.D.S. CORP. intentionally turned a blind eye to Arlin Hatch's history and then-present abuse, still allowing Arlin Hatch to participate in L.D.S. CORP. activities.

80.    As a direct and legal result of the sexual abuse by Arlin Hatch, JACOB JONES experienced physical, emotional and psychological injuries for which he is entitled to monetary damages and other relief.

81.    As a direct and legal result of the sexual abuse by Arlin Hatch, JARED JONES experienced physical, emotional and psychological injuries for which he is entitled to monetary damages and other relief.

19

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

82. L.D.S. CORP.'s action amounted to malicious and oppressive conduct because L.D.S. CORP. knowingly harbored a known sexual predator and placed him in positions of authority over minor congregants. L.D.S. CORP. was in a position to prevent PLAINTIFF from being sexually abused but instead took action to facilitate numerous incidents of sexual abuse by Arlin Hatch.

83. The conduct of L.D.S. CORP. was wanton, malicious, willful, and/or cruel, as a result, PLAINTIFF is entitled to punitive damages.

## COUNT II

### NEGLIGENCE

### (Against L.D.S. CORP. and DOES 1-500)

84. PLAINTIFF incorporates by reference each and every prior allegation as though fully set forth and brought in this cause of action.

85. DEFENDANTS are persons or entities who owed a duty of care to the PLAINTIFF and/or to the minors' parents or had a duty to control the conduct of the perpetrator by way of the special relationship existing between those individuals.

86. As more fully set forth above, Defendants L.D.S. CORP. and DOES 1-500, inclusive, were aware and/or on notice – or at a minimum should have been aware – of Arlin Hatch's sexual misconduct with other minors, prior to the first occasion on which JARED JONES was placed in Arlin Hatch's custody and control, through the acts of L.D.S. CORP.

87. Despite receiving reports of Arlin Hatch sexually abusing minors, Bishop Scott Jones, nor any other leader in the L.D.S. CORP. took any action to prevent further abuse.

88. Accordingly, at the time Arlin Hatch and DOES 1-500, inclusive, performed the acts alleged herein, it was or should have been reasonably foreseeable to DEFENDANTS that by continuously exposing and making PLAINTIFF available to Arlin Hatch, DEFENDANTS were placing them in grave risk of being sexually assaulted by Arlin Hatch.

89. By knowingly subjecting PLAINTIFF to such foreseeable danger, DEFENDANTS were duty-bound to take reasonable steps and implement reasonable safeguards to protect PLAINTIFF from Arlin Hatch. Furthermore, as alleged herein, DEFENDANTS at all

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

times exercised a sufficient degree of control to prevent the acts of assault by Arlin Hatch. However, Defendants L.D.S. CORP. and DOES 1-500, inclusive, failed to take any reasonable steps or implement any reasonable safeguards for PLAINTIFF' protection whatsoever, and continued to make PLAINTIFF accessible for the purposes of sexual assault.

90.    L.D.S. CORP., by and through its agents, including Bishop Scott Jones and others, had actual and constructive knowledge of Arlin Hatch's propensity to sexually abuse minors, but did nothing to protect minor members of L.D.S. CORP. against him.

91.    As a direct and legal result of the negligence by DEFENDANTS, PLAINTIFF JARED JONES experienced physical, emotional and psychological injuries for which they are entitled to monetary damages and other relief.

## COUNT III

### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

### (Against L.D.S. CORP.)

92.    PLAINTIFF incorporates by reference each and every prior paragraph of this Complaint as though set forth in full in this cause of action.

93.    DEFENDANTS are liable for the emotional distress a plaintiff experiences as a result of the breach of a duty of care to the plaintiff where defendants unreasonably endangered the Plaintiff's physical safety or caused them to fear for his safety and experience extreme emotional distress. Defendants' actions must be extreme and outrageous.

94.    DEFENDANTS owed a duty of care to PLAINTIFF to protect them from known sexual abusers.

95.    DEFENDANTS unreasonably endangered PLAINTIFF's physical safety by putting them in direct and frequent contact with a known child sex predator, Arlin Hatch, who DEFENDANTS were protecting.

96.    DEFENDANTS further unreasonably endangered PLAINTIFF's physical safety by requiring Arlin Hatch to babysit PLAINTIFF.

97.    In doing so, Arlin Hatch had unfettered and unsupervised access to PLAINTIFF and thereby sexually abused minor JARED JONES.

21

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

98.     Putting children in direct, unsupervised contact with a known child sex abuser is both extreme and outrageous, and DEFENDANTS knew or should have known that PLAINTIFF would have experienced extreme sexual abuse and emotional distress as a result.

99.     As a direct and legal result of DEFENDANTS' actions and misconduct, PLAINTIFF experienced physical, emotional and psychological injuries for which they are entitled to monetary damages and other relief.

100.    DEFENDANTS' actions amounted to malicious and oppressive conduct because DEFENDANTS knowingly harbored a known sexual predator and placed him in direct contact with minor congregants. DEFENDANTS were in a position to prevent PLAINTIFF from being sexually abused but took actions to facilitate incidences of sexual abuse by Arlin Hatch.

101.    DEFENDANTS' conduct was wanton, malicious, willful, and/or cruel, as a result, PLAINTIFF is entitled to punitive damages.

///

///

////

22

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

**PRAYER FOR RELIEF**

WHEREFORE, PLAINTIFF prays judgment as follows:

105. Against each Defendant, non-economic damages according to proof;

106. Against each Defendant, economic damages according to proof;

107. Against each Defendant, punitive damages according to proof;

108. For attorney fees, as permitted by law;

109. For costs of suit herein; and

For such other and further relief as the court may deem fit and proper.

**JURY DEMAND**

PLAINTIFF demands a trial by jury on all issues so triable.


Date: January 27, 2025                         **ANDREWS THORNTON**


By: _Anne Andrews_
                                               Anne Andrews
                                               Sean T. Higgins
                                               Kimberly DeGonia
                                               Ryan McIntosh
                                               Leilah Rodriguez
                                               ANDREWS & THORNTON
                                               4701 Von Karman Ave., Suite 300
                                               Newport Beach, CA 92660
                                               Emails:
                                               survivor@andrewsthornton.com
                                               aa@andrewsthornton.com
                                               shiggins@andrewsthornton.com
                                               kdegonia@andrewsthornton.com


                                               *Counsel for Plaintiff*


23
**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**